#30445-a-MES
**2024 S.D. 82**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

WILLIAM CHARLES BELT,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MATTHEW M. BROWN
Judge

* * * *

ELIZABETH REGALADO of
Office of the Public Defender
   for Pennington County
Rapid City, South Dakota                    Attorneys for defendant
                               and appellant.


MARTY J. JACKLEY
Attorney General

JOHN M. STROHMAN
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                               and appellee.

* * * *

CONSIDERED ON BRIEFS
SEPTEMBER 30, 2024
OPINION FILED **12/18/24**

#30445

SALTER, Justice

[¶1.]    Following a jury trial, William Belt was convicted of sexual contact with a person incapable of consenting.  In this appeal, he challenges the circuit court's decision to allow expert testimony concerning the presence of inconclusive male DNA found in samples taken from the victim.  He also challenges the court's jury instruction that referenced the "interests of society" and the court's decision to deny his motion for judgment of acquittal.  We affirm.

## Factual and Procedural Background

[¶2.]    In August 2021, 17-year-old D.L. was living with her mother in a small Rapid City apartment, which was included among a number of similar units converted from their previous use as motel rooms.  They were neighbors with Belt and his wife who lived in a nearby apartment, though the two families did not know each other.

[¶3.]    At some point spanning the evening of August 16 and the early morning hours of August 17, D.L.'s mother was detained and held overnight in a sobering facility.  Alone and upset, D.L. began drinking vodka and became highly intoxicated.  The events giving rise to this case occurred during the approximate time period of 10:00 a.m. to 11:30 a.m. on August 17.

[¶4.]    Based upon surveillance video obtained from the apartment's landlord, D.L. visited the apartment of her neighbor, William Belt, two times: once at approximately 10:19 a.m. for about one minute; and a second, longer visit at approximately 10:42 a.m. that lasted approximately 51 minutes.

[¶5.] After leaving Belt's apartment for the second time, police officers determined that D.L. approached a different neighbor and claimed that Belt had raped her. However, the neighbor knew Belt and told D.L. she did not believe her. D.L. returned to her own apartment where she called 911.

[¶6.] Officers responded at approximately 11:48 a.m. and found D.L. sitting on the floor of her apartment crying. The responding officers described her as very intoxicated, and subsequent testing and extrapolation placed her blood alcohol content at between .243% and .258%. D.L. told the officers that Belt tried to put his "thingy" inside her, but she kept telling him no. She was then taken to the hospital to complete a sexual assault response team (SART) kit.

[¶7.] While at the hospital, D.L. provided investigators and the sexual assault nurse examiner (SANE) two different times for the assault. First, she told them that the incident occurred between 2:00 p.m. and 4:00 p.m. the previous day, August 16. But she also related a different time frame which began around 3:00 a.m. on August 17 after her mother was taken to the sobering facility. D.L. told investigators she was unable to sleep and went outside to smoke a cigarette. She said that while she was outside, a man approached her and "lured" her back to his apartment, where he sexually assaulted her while his wife was present. D.L. also informed the SANE that no penetration occurred, but she reported Belt attempted penetration with his fingers.

[¶8.] Belt agreed to be interviewed by law enforcement officers without an attorney present, and he submitted to forensic testing of his person. Officers described him as "very cooperative" during this process. Belt told them that D.L.

had come to his apartment the morning of August 17 before his wife, Betty, left for work and asked them to sign a petition concerning some neighbor children; they declined, and D.L. left. Belt stated that after Betty departed for work, D.L. came back to his apartment and demanded he give her money, threatening to tell people he had raped her if he did not comply. Belt stated that he grabbed her by the arm and ushered her out of his apartment.

[¶9.] The day after the incident, Belt called the police and explained that his landlord had video surveillance evidence that "would exonerate him." Belt sought immediate action because he informed police that the recording would soon be overwritten with new recorded footage. A police officer responded and watched footage of the first minute-long visit. After that, however, the officer remotely accessed a written report concerning the incident from his patrol vehicle and learned that the sequence of reported events included more than the minute-long visit. The officer returned and continued to watch the surveillance footage until he saw evidence of D.L.'s subsequent 51-minute-long visit to Belt's apartment.

[¶10.] Forensic examiners tested DNA swabs taken from both D.L. and Belt. Male DNA was not detected in D.L.'s vaginal or cervical swabs. Male DNA was found on D.L.'s anal, perineal, oral, mons pubis, and fingernail scraping swabs, but the amount of DNA was insufficient to establish a profile. Belt's DNA was present on samples taken from both sides of D.L.'s neck, and D.L.'s DNA was found on samples taken from Belt's hands. Perhaps most notable, examiners found the presence of D.L.'s DNA on penile swabs taken from Belt.

[¶11.]        On September 28, 2022, over a year after the August 2021 incident was reported, a Pennington County grand jury returned a three-count indictment charging Belt with second-degree rape in violation of SDCL 22-22-1(2) or, in the alternative, third-degree rape in violation of SDCL 22-22-1(4). Count 3 of the indictment charged Belt with sexual contact with a person incapable of consenting in violation of SDCL 22-22-7.2.

[¶12.]        Before trial, Belt moved in limine to exclude expert testimony or references to the DNA testing that revealed the presence of male DNA but were otherwise insufficient to identify the contributor. Belt argued that since the samples were inconclusive, there was a high probability of unfair prejudice or confusion because the jury was likely to attribute the unidentified male DNA results to him, especially if the State were allowed to make such an argument.

[¶13.]        The State, however, maintained that it was permitted to argue that the male DNA could belong to Belt, asserting that the probative force of the evidence outweighed any potential for unfair prejudice. The State admitted that it would not argue that the inconclusive DNA was, in fact, Belt's—just that it could be his. The circuit court denied Belt's motion, holding that the probative value of the testimony outweighed any prejudicial effect.

[¶14.]        The case was tried to a jury over the course of three days in May 2023. Belt elected not to testify, but he did call his wife who testified that she had been present during D.L.'s initial visit to their apartment.[1] Belt's defense focused on

---

1.        Notably, Betty's testimony that she was present during D.L.'s visit raised the
         possibility of a third visit by D.L. to the Belt apartment because the

                                                          (continued . . .)

what he argued were weaknesses in the State's evidence that precluded a finding of guilt beyond a reasonable doubt. Belt also suggested, through argument, that the presence of D.L.'s DNA on his penis could be explained as the result of contact between his hands and her arms when he tried to escort her out of his apartment, which, in turn, yielded touch DNA that was transferred to his penis when he used the restroom.[2] The circuit court denied Belt's motion for judgment of acquittal.

[¶15.] While the circuit court and the parties were settling jury instructions, Belt argued that an instruction about deliberations proposed by the State should be modified to eliminate any reference to the "interests of society." Belt argued that the first sentence of the proposed instruction misstated the law by invoking the community conscience. In its entirety, the instruction reads as follows:

> Consider this case carefully and honestly with due regard for the interests of society and the rights of the Defendant. You should decide the case fairly and impartially upon the evidence and the instructions of the Court. It must not be decided from any feeling of bias or prejudice against or sympathy for the Defendant.
>
> Your duty upon such fair consideration of the case is to determine whether the Defendant is guilty or not guilty of the offenses charged in the Superseding Indictment.

_____

(. . . continued)

surveillance video established Betty's car was not present outside of the apartment at the time of D.L.'s first *recorded* visit which occurred when Betty's work time sheet showed she was already at her job.

2.    Later, during the presentence investigation and psychosexual testing, Belt claimed that D.L. was "touching herself" and then touched his arm with a wet hand. Belt theorized D.L. had transferred vaginal secretions to his arm, which he touched and later transferred to his penis when he used the restroom.

[¶16.] The State opposed the request to modify the instruction, noting that the instruction was selected from among the list of Pattern Criminal Jury Instructions. The circuit court agreed with the State and denied the request to modify the proposed instruction which became Instruction 45. The court "acknowledged that there are lines that should not be crossed in terms of what can be argued under the banner of the interests of society[,]" but it ultimately determined that the pattern instruction should not be modified:

> I think that it may be a situation where either the pattern jury instruction folks or the Supreme Court says [I am] wrong - well, the Supreme Court would do that - and this shouldn't be given or this should be modified, but it is pattern. I know that the argument's been made that's a weak crutch to be used, but that's what I'm using. So [Instruction 45] is in without modification.

[¶17.] The jury found Belt not guilty on the alternative rape counts. However, the jury returned a guilty verdict on count 3, which alleged Belt committed sexual contact with a person who was incapable of consenting.

[¶18.] The circuit court ordered a presentence investigation, which included a psychosexual examination. At the sentencing hearing, the court sentenced Belt to five years imprisonment with credit for thirty-one days of time served.

[¶19.] Belt filed a timely notice of appeal, arguing that the circuit court: (1) abused its discretion when it denied Belt's motion in limine to exclude evidence of the inconclusive male DNA test results; (2) erred in giving Instruction 45; and (3) erred in denying Belt's motion for judgment of acquittal as it related to the charge of sexual contact with a person incapable of consent.

## Analysis and Decision

### *The inconclusive male DNA evidence*

[¶20.]	We review evidentiary rulings using our abuse of discretion standard. *State v. Shelton*, 2021 S.D. 22, ¶ 16, 958 N.W.2d 721, 727 (quoting *State v. Bausch*, 2017 S.D. 1, ¶ 12, 889 N.W.2d 404, 408). An abuse of discretion is defined as a "fundamental error of judgment, a choice outside the range of permissible choices, a decision, which on full consideration is arbitrary or unreasonable." *State v. Krueger*, 2020 S.D. 57, ¶ 29, 950 N.W.2d 664, 672 (quoting *State v. Delehoy*, 2019 S.D. 30, ¶ 22, 929 N.W.2d 103, 109). In order to justify relief on appeal, an evidentiary error "must also be shown to be prejudicial." *Id.* ¶ 39, 950 N.W.2d at 674 (quoting *State v. Stone*, 2019 S.D. 18, ¶ 22, 925 N.W.2d 488, 497).

[¶21.]	"Error is prejudicial when, in all probability, it produced some effect upon the final result[.]" *State v. Osman*, 2024 S.D. 15, ¶ 35, 4 N.W.3d 558, 569 (quoting *State v. Loeschke*, 2022 S.D. 56, ¶ 46, 980 N.W.2d 266, 281). "In all probability refers to a 'reasonable probability that, but for [the claimed error], the result of the proceeding would have been different.'" *Id.* (quoting *State v. Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d 674, 686 (alterations in original)). "In other words, 'a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d at 686).

[¶22.]	Although the DNA evidence was introduced through expert testimony, Belt did not object to the expert's qualifications or the reliability of the opinions themselves. Rather, he challenges the admissibility of the inconclusive male DNA testimony on relevancy grounds.

[¶23.]     All relevant evidence is admissible, while irrelevant evidence is not. SDCL 19-19-402. "Evidence is relevant if: (a) [i]t has any tendency to make a fact more or less probable than it would be without the evidence; and (b) [t]he fact is of consequence in determining the action." SDCL 19-19-401. Under SDCL 19-19-403 (Rule 403), a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

[¶24.]     "We have explained that this 'balancing . . . requires a disproportionate level of unfair prejudice before relevant evidence may be excluded.'" *State v. Richard*, 2023 S.D. 71, ¶ 23, 1 N.W.3d 654, 660 (quoting *Knecht v. Evridge*, 2020 S.D. 9, ¶ 22, 940 N.W.2d 318, 326). "The moment evidence is found relevant, the scale 'tips emphatically in favor of admission' absent its probative value being substantially outweighed by Rule 403 concerns." *Id.* (quoting *Knecht*, 2020 S.D. 9, ¶ 22, 940 N.W.2d at 326). "The circuit court has broad discretion when it engages in this balancing function." *Id.* (citing *Knecht*, 2020 S.D. 9, ¶ 22, 940 N.W.2d at 326). The "risk of unfair prejudice alone is not enough to justify exclusion under Rule 403's balancing standard for admissibility[,]" rather, "the risk must substantially outweigh the probative value of the evidence." *Id.* ¶ 25, 1 N.W.3d at 661.

[¶25.]     Here, the circuit court acted within its discretion when it denied Belt's motion in limine to exclude the testimony by the State's DNA expert witness regarding the unidentified male DNA. The court found probative value in the testing results for the challenged DNA, which was determined to be both human

and male, and that this probative value outweighed the potential for unfair prejudice.[3] The court determined the inconclusive male DNA evidence implicated a question of weight but not admissibility. In our view, the court's decision lies within the range of permissible choices.

[¶26.] Consequently, we cannot accept Belt's challenge to the circuit court's assessment of the potential for unfair prejudice. Indeed, his claim that the inconclusive DNA evidence "doesn't prove anything from a scientific point of view" overlooks the undisputed fact that the evidence established a male source. The weight of the evidence ultimately rested with the jury, as the court noted, and the plain fact that the DNA evidence did not identify a particular source did not necessarily preclude its admissibility. Further, within the specific facts of this case, Belt's concern that the jury would "misuse" the inconclusive DNA evidence was neutralized by the fact that the State's other DNA evidence *did* identify his DNA on D.L.'s arms and neck and also revealed the presence of D.L.'s DNA on a penile sample taken from Belt.

[¶27.] In any event, the fact that the inconclusive male DNA evidence did not specifically identify Belt does not render it non-probative under Rule 403. Nor does

---

3. The circuit court did not utilize the correct formulation of the Rule 403 balancing test. As indicated, legally relevant evidence may be admitted not simply because its probative force outweighs the danger of unfair prejudice, but because the probative force is not *substantially* outweighed by the danger of unfair prejudice. *See supra* ¶¶ 22–23. Regardless, the error results in a test that would have favored Belt in the sense that, if applied, the circuit court's balancing would have made it more likely that Belt could have succeeded in excluding the evidence because he was spared the requirement to demonstrate that the risk of unfair prejudice substantially outweighed the probative force.

it necessarily increase the potential for unfair prejudice. It simply "implicates the weight that the jury might assign to it" as it considers the State's evidence. *Richard*, 2023 S.D. 71, ¶ 26, 1 N.W.3d at 661.

### Instruction 45 and the "interests of society"

[¶28.] We review "a circuit 'court's decision to grant or deny a particular instruction' and 'the wording and arrangement of its jury instructions' for an abuse of discretion." *State v. Birdshead*, 2015 S.D. 77, ¶ 14, 871 N.W.2d 62, 70 (quoting *State v. Roach*, 2012 S.D. 91, ¶ 13, 825 N.W.2d 258, 263). However, "a court has no discretion to give an incorrect or misleading instruction[.]" *Id.* (quoting *State v. Jones*, 2011 S.D. 60, ¶ 5 n.1, 804 N.W.2d 409, 411 n.1).

[¶29.] "Jury instructions are adequate when, considered as a whole, they give the full and correct statement of the law applicable to the case." *State v. McVay*, 2000 S.D. 72, ¶ 18, 612 N.W.2d 572, 576 (quoting *State v. Pellegrino*, 1998 S.D. 39, ¶ 9, 577 N.W.2d 590, 594). "This is a question of law reviewed de novo." *Birdshead*, 2015 S.D. 77, ¶ 14, 871 N.W.2d at 70 (quoting *State v. Waloke*, 2013 S.D. 55, ¶ 28, 835 N.W.2d 105, 113).

[¶30.] In the context of a prosecutor's arguments to a jury, we have recognized that "[c]ommunity conscience arguments are improper" because they "ask the jury to place themselves in the shoes of the victim or make an appeal to the jury to protect the community." *State v. Townsend*, 2021 S.D. 29, ¶ 29, 959 N.W.2d 605, 613 (internal citations omitted). Belt relates this rule to Instruction 45 and argues that the circuit court's refusal to eliminate the instruction's reference to the interests of society "impermissibly diverted the jury's attention away from its sole

task of determining Belt's guilt or innocence." According to Belt, the court "compounded its error . . . when it based its decision to give the instruction . . . solely on the fact that it was a pattern jury instruction."

[¶31.] On this latter point, we agree that giving an instruction solely because it is a pattern is an insufficient justification. Pattern jury instructions "have been carefully drafted to reflect the law[,]" by a committee of respected and experienced legal professionals. *State v. Eagle Star*, 1996 S.D. 143, ¶ 15 n.2, 558 N.W.2d 70, 73 n.2. They are "often grounded in long-standing practice" and can be eminently helpful to the litigants and the court. *State v. Nekolite*, 2014 S.D. 55, ¶ 17, 851 N.W.2d 914, 919. However, the instructions themselves are not binding legal authority. *Id.* Because of this, pattern jury instructions cannot be universally regarded as safe harbors for trial court judges. In fact, we recently held in *State v. Nelson*, 2022 S.D. 12, ¶ 51, 970 N.W.2d 814, 830, that a pattern jury instruction did not "accurately reflect the law[.]" Therefore, the circuit court's decision here to defer to the language of Instruction 45 simply because it was a pattern instruction would not, by itself, justify refusing Belt's request to modify the instruction.

[¶32.] However, Belt's argument on the merits that Instruction 45 replicated the unfairness of a prosecutor's community conscience argument is less persuasive. A fair reading of Instruction 45, in context, reminds jurors of their civic duty to consider the case fairly for all parties in a criminal case. Surely, society does have an interest in a criminal case, and to suggest otherwise—that a defendant's interests alone are at stake—seems much too parochial.

[¶33.] The Indiana Supreme Court reached the same conclusion in a case involving a similar instruction that stated the jury was "the moral conscience of our society and must take into account all of the facts and circumstances in this case in order to determine the Defendant's guilt or innocence." *Wilson v. State*, 697 N.E.2d 466, 477 (Ind. 1998). The *Wilson* court rejected the defendant's argument that the instruction represented "an unconstitutional appeal to the community conscience." *Id.* Rather, the court held that the instruction simply "reminds jurors of their special role in the system of justice using language we employ even in the most serious cases of all." *Id.* at 478.

[¶34.] Here, Instruction 45's command to "[c]onsider this case carefully and honestly with due regard for the interests of society and the rights of the Defendant" was not an unlawful judicial call to the jury's community conscience. Nor was the instruction used by the prosecutor as an improper appeal to community conscience. Instead, Instruction 45 merely reminded the jury of its responsibility to consider the case in a way that was fair to both parties in the case.[4]

### Denial of the motion for judgment of acquittal

[¶35.] "The denial of a motion for judgment of acquittal presents a question of law that [the Court] review[s] de novo." *State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83 (quoting *State v. Klaudt*, 2009 S.D. 71, ¶ 14, 772 N.W.2d 117, 122). "The ultimate question . . . is 'whether there is evidence in the record which, if

---

4. The jury's decision to acquit Belt of the more serious rape charges provides tangible, if implicit, support for the view that the jury correctly understood its role and did not perceive a "community conscience" mandate to convict Belt.

believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt.'" *State v. Martin*, 2015 S.D. 2, ¶ 13, 859 N.W.2d 600, 606 (quoting *State v. Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d 329, 342).

[¶36.]     "On review, [the Court] accept[s] the evidence and the most favorable inferences that can be fairly drawn from it that support the verdict." *State v. Wolf*, 2020 S.D. 15, ¶ 13, 941 N.W.2d 216, 220 (quoting *Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d at 342). The Court "do[es] not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence on appeal." *Id.* (quoting *Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d at 342). "If the evidence including circumstantial evidence and reasonable inferences drawn therefrom sustain a reasonable theory of guilt, a guilty verdict will not be set aside." *Id.* (quoting *Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d at 342).

[¶37.]     To convict a defendant of sexual contact with a person incapable of consenting under SDCL 22-22-7.2, the State must prove: (1) the defendant knowingly engaged in sexual contact with the victim; (2) the defendant was fifteen years of age or older; (3) the victim was sixteen years of age or older; and (4) the victim was incapable of consenting to the sexual contact because of physical or mental incapacity. "Mental incapacity" is defined as "a mental or developmental disease or disability that renders a person incapable of appraising the nature of the person's conduct[,]" and "physical incapacity" is defined as "a person's incapability of resisting because the person is unconscious, asleep, or is subject to another physical condition that prevents the person from giving consent or resisting." SDCL 22-22-1.5(3)-(4).

[¶38.] Here, the circuit court did not err when it denied Belt's motion for judgment of acquittal. The State's evidence, if believed by the jury, was sufficient to support a guilty verdict on count 3. Belt principally challenges the physical incapacity element of SDCL 22-22-7.2, but as indicated above, the Legislature's definition of physical incapacity is broad and includes states of unconsciousness, sleep, or "another physical condition that prevents the person from giving consent or resisting." SDCL 22-22-1.5(4).

[¶39.] The record here contains evidence that D.L. was heavily intoxicated; her BAC was three times the legal limit to drive. Intoxication is unquestionably a "physical condition," and the jury could have reasonably concluded that D.L.'s level of impairment rendered her unable to consent to sexual contact. Beyond this, there is evidence that D.L. passed out or was asleep for a time while she was inside Belt's home, and the jury also could have relied upon this evidence to find that D.L. lacked the physical capacity to consent to sexual contact.

[¶40.] We are not persuaded by Belt's argument that "mere intoxication" does not qualify as "physical incapacity" for purposes of the inability to consent under SDCL 22-22-7.2. The argument is indirect and circuitous. Belt asserts that because the separate offense of third-degree rape differentiates between a victim's inability to consent to sexual penetration due to physical or mental incapacity (SDCL 22-22-1(3)) and the distinct basis of intoxication (SDCL 22-22-1(4)), the absence of a corresponding textual distinction under SDCL 22-22-7.2 means that intoxication cannot serve as a basis for a victim's inability to consent to sexual contact.

[¶41.] However, this effort places Belt's view of statutory consonance at odds with our rules for statutory construction. These well-established principles make clear that we must simply apply the text of statutes, as enacted by the Legislature, in the absence of an ambiguity. *See Mohnen v. Est. of Mohnen*, 2024 S.D. 35, ¶ 23, 9 N.W.3d 481, 487 (noting "our well-established rules for statutory interpretation . . . require nothing more than the application of text where it is plain and unambiguous").

[¶42.] Here, Belt does not claim that SDCL 22-22-7.2 is ambiguous, and we do not believe it is. As indicated, a victim could experience physical incapacity because of a state of intoxication. Therefore, the circuit court did not err in denying Belt's motion for judgment of acquittal.

[¶43.] We affirm.

[¶44.] JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN, Justices, concur.