# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3374

_____

Terra Industries, Inc.; Terra      *
International, Inc.,      *
     *
     Appellees,      *
     *   Appeal from the United States
     v.      *   District Court for the Northern
     *   District of Iowa.
National Union Fire Insurance      *
Company of Pittsburgh, PA,      *
     *
     Appellant.      *
     *

_____

Submitted:   April 16, 2004
Filed:   September 10, 2004

_____

Before MORRIS SHEPPARD ARNOLD, MAGILL, and MURPHY, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

National Union Fire Insurance Company appeals the district court's[1] grant of summary judgment in favor of its insureds, Terra Industries and Terra International, Inc. (hereinafter referred to collectively as "Terra"). We affirm the judgment of the district court.

_____

[1]The Honorable Mark W. Bennett, Chief Judge, United States District Court for the Northern District of Iowa.

I.

Until 1999, Terra manufactured and distributed methyl parathion, a pesticide intended for agricultural use. From 1993 to 1997, Terra maintained primary liability insurance policies with CIGNA for claims against Terra stemming from use of the pesticide. These were so-called fronting policies, meaning that Terra's $1 million deductible under the policies for any one year equaled CIGNA's policy limits for that year. Terra also had an excess "claims-made" policy during this period with Lexington Insurance Company that provided coverage after the CIGNA policy limits were exhausted but only for claims made during the Lexington policy's coverage years. When the Lexington policy expired in 1997, Terra purchased a replacement excess policy with National Union that was an "occurrence" policy, meaning that it covered only those claims that were based on incidents that occurred during the policy's coverage years. Moving from a claims-made policy to an occurrence policy created a gap in excess coverage for Terra: Claims made against Terra after the Lexington policy expired in 1997 that were based on incidents that occurred before the National Union policy went into effect would not be covered by either policy. To address this difficulty, Terra and National Union agreed to what is called a sunrise endorsement to the excess policy.

This case arises out of the parties' differing interpretations of the sunrise endorsement. National Union refused to pay any of Terra's litigation costs for defending and settling several methyl parathion suits, where the claims were made after 1997 but were based on pre-1997 occurrences. These suits stemmed from purchases of methyl parathion made during two years when Terra's CIGNA policies were in effect, and Terra does not dispute that the claims are covered by those policies. National Union argues that Terra must exhaust this primary CIGNA coverage before National Union becomes obligated to pay. This would effectively mean that Terra would pay up to $1 million as a deductible for each of the two policy years implicated by the underlying suits before the CIGNA policies were exhausted and National Union's policy would become available. The claims totaled less than

-2-

$1.8 million, and the parties agree that National Union's obligation to pay any part of these claims would not arise if Terra was required to exhaust its CIGNA coverage. But Terra asks us to uphold the district court's ruling that under the sunrise endorsement Terra was not required to exhaust its CIGNA coverage and that National Union's coverage would become available once Terra's liability for all the claims exceeded $1 million.

II.

The parties agree that Iowa law governs this diversity case. To determine the point at which National Union's coverage becomes available to Terra under the sunrise endorsement, we construe the insurance policy "as a whole, not by its separate provisions," *LeMars Mut. Ins. Co. v. Farm & City Ins. Co.,* 494 N.W.2d 216, 218 (Iowa 1992). We must "seek to ascertain from [the policy's] words the intent of the insurer and insured at the time the policy was sold." *Grinnell Mut. Reinsurance Co. v. Voeltz*, 431 N.W.2d 783, 785 (Iowa 1988). To do that, Iowa law requires that we give terms that are undefined by the policy the meaning that a reasonable person would give them. *AMCO Ins. Co. v. Rossman*, 518 N.W.2d 333, 334 (Iowa 1994). Iowa courts have held that while an insurance policy and its endorsements should be construed, if possible, to give effect to all provisions, where provisions in the body of the policy are in "irreconcilable conflict" with those of an endorsement, the provisions of the endorsement control. *Motor Vehicle Cas. Co. v. LeMars Mut. Ins. Co.*, 254 Iowa 68, 72, 116 N.W.2d 434, 436 (1962).

Terra's main policy with National Union provides liability coverage for post-1997 occurrences for "sums in excess of the Retained Limit." As relevant, the policy defines "Retained Limit" as "the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other underlying insurance providing coverage to [Terra]." Attached to the main policy is a Schedule of Underlying Insurance that specifically lists the CIGNA policies. Because the main policy does not provide coverage until Terra's primary insurance

-3-

has been exhausted it is plainly an excess policy. But we will not assume that the endorsement was intended to provide only excess coverage simply because it was added to an excess policy. Instead we must examine the specific terms of the parties' entire agreement to determine the endorsement's meaning.

The sunrise endorsement states, in relevant part, as follows:

This contract will provide coverage only for those Occurrences happening on or between the dates *January 1, 1985* and *July 1, 1997* which would otherwise be covered by the terms and conditions of this contract and which had not been reported to the Insured or to any of the Insured's Insurance Carriers on or between the dates *January 1, 1985* and *July 1, 1997. ...*

Solely as respects the coverage afforded by this contract the following underlying coverages and limits (known herewith as the Schedule of Underlying Insurance) apply. It is understood that these limits are unimpaired.

| General Liability | $1,000,000 each occurrence |
| Products/Completed Operations Liability | $1,000,000 each occurrence |
| Automobile Liability | $1,000,000 each occurrence |
| Employers Liability | $1,000,000 each occurrence |
| Aircraft Liability | $1,000,000 each occurrence |

...
All other terms and conditions of this policy remain unchanged.

The parties agree that of the limits listed in the sunrise endorsement, only the $1 million in Products/Completed Operations Liability is applicable to the methyl parathion claims. For the reasons that follow we believe that the terms of the National Union policy and the endorsement support the conclusion that the CIGNA policies (and prior claims made against them) are of no consequence to the sunrise-endorsement claims.

We are not convinced by National Union's contention that although the CIGNA policies are not mentioned in the endorsement, they nevertheless must be exhausted as "other underlying insurance." As we have said, under the main policy National Union agrees to pay "sums in excess of the Retained Limit," which is the sum of two items: the limits in the "policies" listed in the "Schedule of Underlying Insurance" (which includes the CIGNA policies) and the applicable limits of "any other underlying insurance." Although the sunrise endorsement does not refer to any "Retained Limit," National Union argues that Terra must also exhaust the "Retained Limit" before coverage is available under that endorsement. According to National Union, because the endorsement states that its "underlying coverages and limits" are "(known herewith as the *Schedule of Underlying Insurance*)" (emphasis added), the monetary limits in the endorsement replace only the "Schedule of Insurance" part of the "Retained Limit" in the main policy. Since the main policy states that the "Retained Limit" also includes "other underlying insurance," the argument goes, the CIGNA policies must be exhausted as "other underlying insurance," even though they are omitted from the "Schedule of Underlying Insurance" in the sunrise endorsement.

But we do not believe that a parenthetical reference to "Schedule of Insurance" is what is most important in the endorsement. While the main policy plainly provides coverage in excess of other listed and unlisted insurance policies, the sunrise endorsement makes no reference whatsoever to any other insurance policies or to "Retained Limits" and contains a schedule of "underlying coverages and limits" in specific monetary amounts. The endorsement refers to these monetary amounts as "*the ... underlying coverages and limits*" that are applicable "*[s]olely* as respects the coverage afforded by this contract" (emphasis added). We believe that this language indicates that the monetary limits are unique to the sunrise endorsement and are the exclusive "underlying coverages and limits" that must be exhausted before coverage becomes available under that endorsement.

-5-

We also reject as unreasonable National's Union's interpretation of the phrase "other underlying insurance" to include the CIGNA policies for purposes of the endorsement but not for purposes of the main policy. "Other underlying insurance," as used in insurance contracts, generally refers to primary policies that the insurer was unaware of or that did not exist at the time that the policy was agreed to. Thus the phrase was not intended to cover policies that National Union could have spelled out in the endorsement's Schedule of Underlying Insurance, as it did in the main policy's Schedule of Underlying Insurance. The excess insurer's rationale for separating known and unknown policies is to ensure that the insured maintains at least the known primary insurance policies while not forgoing any contribution from additional primary coverage that may be obtained after the excess policy's adoption. We are to determine the parties' intent from the language of the entire contract, and we note that if National Union intended to include the CIGNA policies as part of the underlying coverage it could have easily referred to them in the endorsement but did not. We therefore agree with Terra that the endorsement fully replaces the main policy's retained limit calculations with its "underlying coverages and limits" in definite monetary amounts, and that National Union's obligation under the endorsement arises when Terra's total liability on the methyl parathion lawsuits exceeds $1 million.

As we have said, we believe that Terra's interpretation of the contract is the correct one. But even if we believed that National Union's interpretation was reasonable as well, Terra would still prevail. That is because if the language of an insurance policy is "fairly susceptible to two interpretations," *LeMars Mut. Ins. Co. v. Joffer*, 574 N.W.2d 303, 308 (Iowa 1998), an ambiguity exists, and we must construe the policy "in the light most favorable to the insured," *Cincinnati Ins. Co. v. Hopkins Sporting Goods, Inc.*, 522 N.W.2d 837, 839 (Iowa 1994).

III.

National Union also argues, in the alternative, that Terra failed to establish that it is entitled to any coverage under the terms of the endorsement. The endorsement applies to occurrences "happening on or between the dates January 1, 1985 and July 1, 1997 ... which had not been reported to the insured or to any of the Insured's Insurance Carriers on or between the dates January 1, 1985 and July 1, 1997" (emphasis omitted). National Union argued in its response to Terra's summary judgment motion and again on appeal that Terra did not establish that the occurrences leading to the methyl parathion lawsuits were not reported to Terra or to its insurance carriers. The district court did not address the issue in its opinion.

Terra's general counsel stated in his deposition that "[t]he first lawsuit naming Terra as a defendant was filed ... on November 12, 1997. This lawsuit was the first notice Terra had of any claims involving its methyl parathion product." National Union does not dispute this statement but argues that the statement does not establish that Terra was not aware of any "occurrence" before July 2, 1997. National Union, however, attached Terra's verified interrogatory answers to its own motion for summary judgment, which included the following statement: "The occurrence [regarding the use of methyl parathion that led to the lawsuits] was first reported to Terra when it was served with the first of the underlying lawsuits in November of 1997." The district court was not constrained to view only the evidence submitted by Terra to support its summary judgment motion; the court could consider any evidence in the record.

National Union, however, is correct that neither party provided any evidence that bears on whether the occurrences leading to the methyl parathion lawsuits were reported to Terra's other insurance carriers before July 2, 1997. Generally, the burden is on the insured to show that a loss is covered by the policy. *See* 17 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 254:52 (3d ed. 2001). The question here

is whether Terra was required specifically to plead and prove lack of notice to its other insurers in order to be entitled to summary judgment.

Phrases in insurance policies that limit coverage can be either conditions precedent to coverage or exclusions from coverage. "[A] condition precedent is one whose performance or occurrence plaintiff must prove in order to recover." *Henschel v. Hawkeye-Security Ins. Co.*, 178 N.W.2d 409, 417 (Iowa 1970). For example, many liability insurance policies require that the insured notify the insurer of any claim immediately or as soon as practicable as a condition precedent to coverage for a particular claim. *See, e.g., id.* at 412, 420. The insured must demonstrate that he or she substantially complied with this condition or that noncompliance was excused, waived, or did not prejudice the insurer. *See, e.g., Grinnell Mut. Reinsurance Co. v. Jungling*, 654 N.W.2d 530, 541-42 (Iowa 2002). Otherwise, the insurer does not have to indemnify the insured for damages awarded against him. The burden to prove that conditions precedent were satisfied lies with the insured. *See id.*

Exclusions, however, carve out some particular events from a coverage that is otherwise general, and the insurer has the burden of proving them. For example, some life insurance policies cover accidental death but specifically exclude death from certain causes, such as "voluntary exposure to unnecessary danger." *E.g., Jones v. United States Mut. Accident Ass'n of N.Y.*, 92 Iowa 652, 61 N.W. 485, 486-87 (1894). Under such a policy, the death of the insured is presumed not to have resulted from the causes specifically omitted from coverage, and the burden is on the insurer to prove that the exclusion from the policy applies in order to avoid payment. *See id.* at 487. The beneficiary of the policy does not have to prove that the insured's death did not fall within an exception.

Some courts, in making the distinction between conditions precedent and exclusions, look at the placement of the phrase within the policy and the exact language used. *See Couch*, *supra*, § 254:93. On this basis, the phrase at issue in this

case looks more like a condition precedent than an exclusion because exclusions are usually set apart from general coverage language. *Id*. On the other hand, the words that frequently foretell conditions precedent, such as "if" or "so long as," are not present. National Union could have stated more clearly that the phrase at issue was to operate as a condition precedent if it had wanted to. In fact, in the text of the main policy, there are sections of the policy devoted to the "Exclusions" from coverage and the "Conditions" of coverage. This format, however, was not followed in the sunrise endorsement.

Conditions precedent frequently involve something that the insured must do while exclusions involve something that the insured must not do. *See, e.g., Sager v. Farm Bureau Mut. Ins. Co.*, 680 N.W. 2d 8, 9-10 (Iowa 2004); *Jungling*, 654 N.W. 2d at 541-42; *Estate of Tedrow v. Standard Life Ins. Co.*, 558 N.W.2d 195,197 (Iowa 1997). This difference provides a rationale for shifting the burden of proof from the insured to the insurer for exclusions: While the insured should be required to prove that he or she took some affirmative action upon which insurance was conditional, the insurer should bear the burden to prove that the insured took a prohibited action. This dichotomy makes sense because it prevents either party from having to prove a negative. In this case, if lack of notice is a condition precedent, Terra would be required to prove that its insurance carriers did not know about the occurrences. This would not be altogether reasonable because it not only would require Terra to prove a negative, it would require it to prove something that is not even necessarily within its knowledge. We therefore believe that the provision at issue here is better viewed as an exclusion.

Finally, as we have noted, under Iowa law an ambiguity as to the meaning of an insurance policy is resolved in favor of the insured. *See, e.g., Cincinnati Ins.*, 522 N.W.2d at 839. This rule furnishes an additional reason for us to conclude that it is National Union's burden to prove that Terra's other insurers, in fact, knew of the occurrences before July 2, 1997.

It is well established that in summary judgment proceedings, all facts must be viewed in the light most favorable to the nonmovant, which in this case was National Union. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Where a defendant attempts to avoid summary judgment by relying on an issue on which it would have the burden of proof at trial, however, it must establish that it can meet its burden. *See Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1552 (11th Cir. 1990). The nonmovant cannot rely solely on allegations to survive a summary judgment motion. *See* Fed. R. Civ. P. 56(e). National Union attempts to do just that. Because the phrase is an exclusion, National Union, not Terra, had the burden to point to some evidence that Terra's other insurance carriers had notice of the occurrences prior to July 2, 1997. There being no such evidence, summary judgment in favor of Terra was proper.

IV.

For the reasons indicated, we affirm the judgment of the district court.

_____